IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

WESTFIELD INSURANCE COMPANY,       )
                                   )
        Plaintiff,              )
                                   )
v.                                 )       Case No.: 5:18-cv-00100-JPB
                                   )
SISTERSVILLE TANK WORKS, INC.,     )
ROBERT N. EDWARDS, DEBORAH S.      )
EDWARDS, E. JANE PRICE, Individually )
and as Executrix of the Estate of Robert )
G. Price, deceased, GARY THOMAS SANDY, )
PEGGY P. SANDY, DOUGLAS L. STEELE, )
and CAROL STEELE,                  )
                                   )
        Defendants,             )
                                   )
_____)
                                   )
SISTERSVILLE TANK WORKS, INC.,     )
                                   )
        Defendant,              )
        Counterclaim Plaintiff, )
        and Third-Party Plaintiff, )
                                   )
v.                                 )
                                   )
REAGLE & PADDEN, INC., and         )
DAVID C. PADDEN,                   )
                                   )
        Third-Party Defendants.  )

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANT/THIRD-PARTY PLAINTIFF SISTERSVILLE TANK WORKS, INC.

Defendant/Third-Party Plaintiff Sistersville Tank Works, Inc. (hereinafter "STW") has

moved the Court for complete summary judgment in its favor pursuant to Rule 56 of the Federal

Rules of Civil Procedure on Plaintiff Westfield Insurance Company's (hereinafter "Westfield)

Complaint for Declaratory Relief [Doc. 1].  Discovery is complete and the record is sufficiently



developed to establish that there are no genuine issues of material fact in controversy and that without further delay, STW is entitled to judgment as a matter of law.

## I.    INTRODUCTION

This is an action for declaratory judgment brought by Westfield against STW.  Westfield is asking that the Court declare that Westfield is not required to defend and indemnify STW in several actions pending in state court in which STW is accused of negligence causing cancer to the underlying plaintiffs.  For the reasons set forth hereinbelow, the Court should grant STW summary judgment against Westfield and declare that Westfield owes STW a continuing duty to defend under the terms of certain CGL and umbrella liability policies issued from January 1, 1985 to April 15, 1989.

## II.    STATEMENT OF FACTS

### A. STW's Corporate History

STW is a family-owned and operated West Virginia corporation located in Sistersville, West Virginia.  STW manufactures, repairs, and installs industrial storage tanks for the chemical, petroleum, energy, and pharmaceutical industries—both domestic and international.  The current STW was organized from the former version of Sistersville Tank Works by Janet Wells and her daughter Darlene Morgan.  Wells and Morgan, life-long residents of Pleasants County, West Virginia, were the bookkeeper and sales agent, respectively, for the prior Sistersville Tank Works which was a division of Varlen Corporation.  In 1984, Wells and Morgan formed Tyler County Tank Works, Inc., to purchase Sistersville Tank Works' assets and name, but not its liabilities, from Varlen.[1]  **Exhibit 1, Janet Wells Depo., pp. 13-16**.  Upon completion of its purchase of the

---

[1] The original STW entity dates back to 1894, and was a company built to supply the growing Mid-Ohio Valley with oil field boilers, tanks, and pressure vessels.

STW assets from Varlen in October of 1984, Tyler County Tank Works, Inc., was renamed Sistersville Tank Works, Inc. **Exhibit 1, Janet Wells Depo., pp. 15-16.**[2]

### B. The Underlying Litigation

When this action commenced, STW was named as a defendant in four actions in West Virginia circuit courts—Edwards, Price, Steele, and Sandy.[3] Three of those cases—Edwards, Price, and Steele[4]—are pending in the Circuit Court of Marshall County. In each of those cases, the plaintiff claims to have been exposed to harmful chemicals as a result of STW's negligent manufacture, installation, repair and/or maintenance of storage tanks at the industrial sites where they were employed. *See* Steele, Price, and Edwards Complaints [Doc. 176-1]. The Sandy action is an asbestos case pending in Kanawha County, West Virginia.[5] STW was dismissed from the Sandy action without prejudice on June 14, 2019. **Exhibit 3.**[6]

---

[2] Janet Wells and Darlene Morgan have owned and operated and expanded STW since their acquisition of the company in October of 1984 and continue to be involved in its day-to-day operations. Janet Wells serves as STW's President and Darlene Morgan serves as STW's Vice President and Secretary. **Exhibit 1, Janet Wells Depo., pp. 23-24.** Janet's grandsons and Darlene's sons, Zach and Jason Morgan, oversee day-to-day operations of the company. Zach is in charge of production and shop operations. Jason Morgan is the CFO and assistant plant manager. In 2016, Jason Morgan and Zach Morgan acquired their own stakes in the company and STW is poised for the family's third-generation of operations. **Exhibit 2, Jason Morgan Depo., pp. 12-13.**

[3] Westfield defended STW in three previous state court actions under the 1989-2010 CGL Policy. Those previous actions were—*Hubbard v. Amsted Industries, Inc.*, Kanawha County Civil Action No. 10-C-593 filed on March 29, 2010; *Fischerkeller v. 20th Century Glove Corp.*, Kanawha County Civil Action No. 11-C-366 filed on March 30, 2011; and *Bowen v. Axial Corp.*, Marshall County Civil Action No. 14-C-173K filed on October 23, 2014. Like the underlying actions before the Court, *Hubbard*, *Fischerkeller*, and *Bowen* each involved claims of latent bodily injuries resulting from exposure to hazardous substances. *Hubbard* and *Fischerkeller* were asbestos claims. *Bowen* was a benzene exposure claim.

[4] Edwards v. Covestro, Marshall County Civil Action No. 16-C-32 was filed on February 22, 2016; Price v. Sistersville Tank Works, Inc., Marshall County Civil Action No. 17-C-62H was filed on April 24, 2017; and Steele v. Sistersville Tank Works, Inc., Marshall County Civil Action No. 17-C-231H was filed on November 15, 2017.

[5] Sandy v. 3M Company, Kanawha County Civil Action No. 17-C-965KAN was filed on July 5, 2017.

[6] On May 13, 2019, Sistersville Tank Works, Inc., was named as a defendant in Kemp v. Covestro, Marshall County Civil Action No. 19-C-113C. The Kemps are represented by the same law firm as the plaintiffs in Edwards, Price, and Steele. The allegations against STW in Kemp mirror the claims in Edwards, Price, and Steele. To date Westfield has not moved to amend its Complaint to add the Kemp action to these proceedings.

3

The Edwards, Price, and Steele claimants were diagnosed with cancer in 2014, 2015, and 2016, respectively.[7] Each claimant alleges that his cancer was caused by his exposure to harmful substances at his worksite from the 1960s to the early 2000s.[8] [Doc. 176-1]. Each claimant alleges that harmful exposures were caused by STW's negligent manufacture, installation, inspection, repair and/or maintenance of chemical tanks and vessels at the Bayer or PPG worksites. [Doc. 176-1].

## C. Pertinent Proceedings

Westfield instituted this declaratory judgment action seeking a declaration that it owes STW no duty to defend or indemnify in each of the underlying cases. [Doc. 1].[9] Westfield claims to have only insured STW from April 15, 1989 to April 15, 2010, under Policy No. 3471223 and Policy No. 3471224. [Doc. 1, Doc. 39-1, Doc. 39-2, Doc. 39-3, and Doc. 39-4]. Policy No. 3471223 is a commercial general liability policy with a policy period from April 15, 1989 to April 15, 2010 (hereinafter the "1989-2010 CGL Policy"). The 1989-2010 CGL Policy specifically excludes coverage for claims arising from "products" and "completed operations". [Doc. 1, ¶¶51-66]. Policy No. 3471224 is a "claims made" policy issued by Westfield from April 15, 1989 to April 15, 2001, which provided STW with "products/completed operations" coverage. [Doc. 1,

---

[7] Mr. Edwards alleges he was diagnosed with renal cell carcinoma on April 22, 2014. [Doc. 176-1, pp. 1-7]. Mrs. Price alleges her late husband was diagnosed with acute myeloid leukemia on April 28, 2015. [Doc. 176-1, pp. 8-28]. Mr. Price passed away on June 6, 2015. Mr. Steele alleges that he was diagnosed with chronic lymphocytic leukemia in January of 2016. [Doc. 176-1, pp. 28-48].

[8] Mr. Edwards alleges that his renal cell carcinoma was the result of his exposure to nephrotoxic chemicals during his employment with Bayer Corp. (and its predecessor corporations Mobay, Inc., and Miles, Inc.) from 1962 to 2001. [Doc. 176-1, pp. 1-7]. Mrs. Price alleges that her husband's acute myeloid leukemia and death were caused by his exposure to benzene and/or formaldehyde products throughout his employment at Bayer/Miles/Mobay from 1960 to 1995. [Doc. 176-1, pp. 8-28]. Mr. Steele alleges that his chronic lymphocytic leukemia was caused by his exposure to benzene products through his employment for PPG (and its successor Axiall) from 1986 to 2006. [Doc. 176-1, pp. 28-48].

[9] Westfield has defended STW in the underlying actions under reservations of rights.

¶¶48-49].[10]  Inasmuch as each of the underlying claims was brought after the policy period had ended under this "claims made" policy, the parties agree that Policy No. 3471224 does not provide STW coverage against such claims.

As noted above, Westfield asks the Court to interpret the 1989-2010 CGL Policy and find that it owes no duty to defend or indemnify STW in each of the underlying cases.  [Doc. 1]. Significantly, discovery has revealed that Westfield also insured STW under a series of CGL and umbrella policies from January 1, 1985 to April 15, 1989, under which it owes STW a continuing duty to defend.  *See* discussion *infra*.[11]  On July 5, 2018, STW answered Westfield's Complaint and asserted various counterclaims against Westfield.[12] [Doc. 7].[13]  On October 9, 2018 [Doc. 42], and November 29, 2018 [Doc. 53], the Court ordered the bifurcation for trial of the coverage claims from STW's Counterclaim and Third-Party Complaint.  The Court further ordered that discovery proceed on all issues in a unitary manner.  [Doc. 42 and Doc. 53].

Following STW's discovery of additional CGL and umbrella policies issued to STW prior to April 15, 1989, STW moved for leave to file its Amended Counterclaim to bring before the Court additional Westfield policies.  [Doc. 120].  These additional Westfield policies were not identified in Westfield's Complaint and contain none of the exclusions relied upon by Westfield

---

[10] STW replaced the Westfield "claims made" "products/completed operations" coverage (Policy No. 3471224) from April 15, 2001 to April 15, 2010, with a similar policy issued by General Star Insurance.

[11] Westfield denies the applicability of this newly discovered policy for nebulous reasons.  *See* discussion *infra*, p. 25.

[12] STW's counterclaims against Westfield included claims for negligence and recklessness, breach of fiduciary duty, reasonable expectations, declaratory relief, breach of contract, breach of implied covenant of good faith and fair dealing, unfair settlement practices, bad faith, and punitive damages.  [Doc. 7].

[13] On July 18, 2018, STW filed its Third-Party Complaint against Reagle & Padden, Inc., and David C. Padden, the long-time insurance agents who brokered the coverage at issue with Westfield.  [Doc. 11].  STW has utilized Reagle & Padden, Inc., to obtain insurance on its behalf since the inception of the company, starting in 1985, and relied upon and trusted Reagle & Padden, Inc., to obtain all necessary insurance.  **Exhibit 1, Janet Wells Depo., pp. 162-168; Exhibit 4, Darlene Morgan Depo., p. 142.**  For its Third-Party Complaint, STW has alleged claims against Reagle & Padden for it negligence and malfeasance in a professional capacity.

under the 1989-2010 CGL Policy. *See* discussion *infra*. On April 29, 2019, the Court granted STW leave to file its Amended Counterclaim, which STW did on April 30, 2019. [Doc. 120 and Doc. 123]. However, on July 15, 2019, the Court dismissed STW's Amended Counterclaim without prejudice on ripeness grounds, leaving the question of coverage and STW's Third-Party Complaint remaining. [Doc. 249].

All discovery on Westfield's Complaint has been completed and STW's motion for summary judgment is ripe for the Court's consideration.

## III.    STANDARD OF REVIEW & JURISDICTION

### A. Summary Judgment Standard

The Court may grant a party summary judgment as to all or part of a claim or defense if the movant can demonstrate that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Dunigan v. Purkey*, 2018 U.S. Dist. LEXIS 143565 *20 (N.D.W. Va. July 25, 2018). A "dispute" is considered "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a Rule 56(a) motion, the Court must view all evidence in the light most favorable to the nonmoving party. *Dunigan*, at *20.

### B. The Federal Declaratory Judgment Act

Federal courts with diversity jurisdiction must apply state substantive law but federal procedural law. *Liberty Corp. Capital Ltd. v. Peacemaker Nat'l Training Ctr., LLC*, 348 F. Supp. 3d 585, 590 (N.D.W. Va. 2018). The Declaratory Judgment Act, 28 U.S.C. § 2201, is a purely procedural statute which grants district courts the discretionary power to entertain declaratory judgment actions. *State Farm Fire & Cas. Co. v. Kirby*, 919 F. Supp. 939 (N.D.W. Va. 1996);

6

*Herbalife Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2006 U.S. Dist. LEXIS 19180 *8-9 (N.D.W. Va. Mar. 30, 2006).[14]

> To obtain declaratory relief under 28 U.S.C. §2201(a):
>
> [t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts. The relief is available only for a concrete case admitting of an immediate and definite determination of the legal rights of the parties.

*Young v. Blatt*, 2013 U.S. Dist. LEXIS 158967 *10 (N.D.W. Va. Nov. 6, 2013) (citation omitted).

A declaration of parties' rights under an insurance contract is an appropriate use of the declaratory judgment mechanism. *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998). Indeed, "[t]he declaratory judgment action is designed to allay exactly the sort of uncertainty that flows from the threat that ambiguous contractual rights may be asserted. *Id*.

## C. Choice of Law

The Court should find that West Virginia's substantive law applies to the interpretation of the policies in this action. The provisions of an insurance policy "will ordinarily be construed according to the laws of the state where the policy was issued and the risk insured was principally located, unless another state has a more significant relationship to the transaction and the parties." Syl. Pt. 2, *Lee v. Saliga*, 179 W. Va. 762, 373 S.E.2d 345 (1988).

Beginning in 1985 the policies in question were issued on behalf of Westfield by its broker Reagle & Padden, Inc., a West Virginia insurance agency, to STW, a West Virginia corporation

---

[14] 28 U.S.C. § 2201(a) provides, in pertinent part:
    In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

with its principal place of business in Tyler County, West Virginia.  Therefore, the Court should

find that the insurance contracts were entered into in West Virginia, and as such, West Virginia

law applies.  Alternatively, if the Court were to find that the insurance contracts were entered into

in Ohio, where Westfield is located, the Court should nevertheless find that West Virginia has "a

more significant relationship to the transaction and the parties" involved, and, as such, West

Virginia law applies to the interpretation of the policies. *Id.*[15]

### D.  West Virginia Insurance Law

The Court's coverage determination is a substantive question of law subject to West

Virginia law.  *Liberty Corporate Capital Ltd.*, 348 F. Supp. 3d at 590; *see also Tennant v.*

*Smallwood*, 211 W. Va. 703, 568 S.E.2d 10, 11 (2002).  Unambiguous insurance policy provisions

are to be applied according to their plain meaning.  *Keffer v. Prudential Ins. Co.*, 153 W. Va. 813,

172 S.E.2d 714 (1970).  The interpretation of an insurance contract, including the question of

whether the contract is ambiguous, is a question of law.  Syl. Pt. 2, *Riffe v. Home Finders Assocs.*,

205 W.Va. 216, 517 S.E.2d 313 (1999).  When a policy's provisions are ambiguous, they are to

be construed liberally in the insured's favor.  *Erie Ins. Prop. & Cas. Co. v. Edmond*, 785 F. Supp.

2d 561, 565 (N.D.W. Va. 2011); *see also Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 378,

376 S.E.2d 581, 584 (1988).  A policy is ambiguous when it is reasonably susceptible of more than

one meaning and reasonable minds may disagree as to its meaning.  *Glen Falls Ins. Co. v. Smith*,

217 W. Va. 213, 221, 617 S.E.2d 760, 768 (2005).  A court is to give the language of an insurance

policy such a construction as to meet the reasonable expectations of the insured.  *Bailes v. Erie*

*Ins. Prop. & Cas. Co.*, 2010 U.S. Dist. LEXIS 5556 *5 (S.D.W. Va. Jan. 25, 2010).  "[W]here the

---

[15] Here, the only relationship in this action to Ohio is Westfield.  In addition to both STW and Reagle & Padden, Inc., being located and incorporated under the laws of West Virginia, each of the underlying state court actions involve West Virginia workers, allegedly injured on the job in West Virginia, from alleged exposures to hazardous substances in West Virginia. *See* Steele, Price, and Edwards Complaints [Doc. 176-1].

policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." *Jenkins v. State Farm Mut. Ins. Co.*, 219 W. Va. 190, 194, 632 S.E.2d 346, 350 (2006) (citation omitted).

An insurer's duty to defend is broader than its duty to indemnify. *Edmond*, 785 F. Supp. 2d at 565. To determine whether an insurer owes its insured a defense, the court must compare the policy provisions to the allegations in the underlying complaint. *Id.* at 564. "Resolution of the duty to defend question requires examination of (1) the policy language to ascertain the terms of the coverage and (2) the underlying complaint to determine whether any claims alleged therein are covered by the policy." *Erie Ins. Prop. & Cas. Co. v. Viewpoint, Inc.*, 2013 U.S. Dist. LEXIS 30646 *6-7 (N.D.W. Va. Mar. 6, 2013) (quotation and citation omitted). This is known as the "eight corners rule." *Id.* Under the "eight corners rule", an insurer has a duty to defend whenever a claim against the insured could impose liability for risks the policy covers. *Edmond*, 785 F. Supp. 2d at 565. The underlying claims need only be "reasonably susceptible" to an interpretation requiring coverage for the duty to defend to arise. *Id.* If there is coverage under the policy for some claims but not others the insurer must defend the covered and uncovered claims alike. *Id.*

## IV.   THE 1988-89 CGL AND UMBRELLA POLICIES

### A.   The 1988-89 CGL Policy No. CWP3457716-01

Among the "destroyed"[16] Westfield policies uncovered by STW within its own files is a CGL "renewal" policy with a policy period from January 1, 1988 to April 15, 1989 (hereinafter

---

[16] For its Complaint for Declaratory Relief, Westfield did not reveal the existence of any CGL policies which it had sold to STW prior to the 1989-2010 CGL Policy. [Doc. 1]. It was only in response to STW's discovery demands that Westfield finally acknowledged numerous previous liability policies it issued to STW. [Doc. 109-5, pp. 7-8]. Westfield claims to have destroyed all such policies issued prior to April 15, 1989, pursuant to its vague document retention policy; however, Westfield has offered no proof of such destruction in compliance with any such policy.

the "1988-89 CGL Policy" or "the Policy")[17], designated Policy No. CWP3457716-01.[18]  The

Policy contains a $2,000,000 "General Aggregate Limit (Other than Products/Completed

Operations)" and a $1,000,000 "Products/Completed Operations Aggregate Limit." *See* General

Liability Coverage Renewal Declarations. **Exhibit 8.**[19]

      The "General Liability Coverage Renewal Declarations" (hereinafter "Declarations")

identifies seven "Forms and Endorsements Applicable To This Coverage Part." **Exhibit 8**. Each

of the "forms and endorsements" identified in the "Declarations" to the CGL coverage is included

with the appended 1988-89 CGL Policy. **Exhibit 7**. The most important of these forms is the

"Commercial General Liability Coverage Form" identified as "Form CG00011185" (hereinafter

"Coverage Form"). **Exhibit 7, pp. 1-9**. The Coverage Form includes the Policy's "Insuring

Agreement" and "Exclusions" for the bodily injury and property damage liability coverage.

**Exhibit 7, p. 1**.

      The "Insuring Agreement" to the 1988-89 CGL Policy provides that Westfield "will pay

those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'

or 'property damage' *which occurs during the policy period*." **Exhibit 7, p. 1**. The agreement

further provides that the "bodily injury" and "property damage" must be caused by an "occurrence"

---

[17] The policy period to the 1988-89 CGL Policy originally spanned from January 1, 1988 to January 1, 1989. The policy period was extended twice by Westfield first to April 1, 1989, and then to April 15, 1989. **Exhibit 5**.

[18] The 1988-89 CGL Policy was sold by Westfield to STW as part of a package of commercial insurance coverages which also included commercial property coverage, commercial auto coverage, commercial inland marine coverage and employers' liability coverage. Each of these coverages are contained in a package titled "Westfield Insurance Company – Commercial Insurance Coverages" provided to STW following its renewal of the 1985-88 CGL policy. The complete insurance package for 1988-89 policies is appended as **Exhibit 6**. The 1988-89 CGL Policy is one part of the 1988-89 insurance package sold by Westfield to STW. The 1988-89 CGL Policy portion of the 1988-89 insurance package is appended as **Exhibit 7**.

[19] The original CGL policy sold by Westfield to STW was for a three-year term from January 1, 1985 to January 1, 1988. **Exhibit 9**. The declarations page to the 1988-89 CGL Policy identifies it as a "renewal" of the original policy. **Exhibit 8**.

and such "occurrence" must take place in the "coverage territory."[20]   **Exhibit 7, p. 1.**   The

Coverage Form includes a list of policy exclusions none of which have application to any of the

claims asserted against STW.  **Exhibit 7, pp. 1-3.**  More significant is the absence of an exclusion

for "products and completed operations" which is found in the 1989-2010 CGL Policy.

### B.   The 1988-89 Umbrella Policy No. UXC5307375

Along with the renewal of its original CGL policy, STW also renewed its Umbrella

coverage with Westfield. X-Cess Indemnity Policy (Policy No. UXC5307375) (hereinafter "1988-

89 Umbrella Policy"), **Exhibit 10.**[21]  The Declarations to the 1988-89 Umbrella Policy provide

$2,000,000 "General Aggregate" liability limits, $1,000,000 "Products/Completed Operations

Aggregate" limits and $1,000,000 "Each Occurrence" limits.  **Exhibit 11, p. 2.**  The "Insuring

Agreement" to the 1988-89 Umbrella Policy provides that Westfield "will indemnify [STW] for

'ultimate net loss' in excess of the applicable underlying limit which the insured shall become

legal obligated to pay as damages because of ... 'Personal Injury'..." **Exhibit 10, p. 3.**[22] Pursuant

to Section 2.3 of policy,   titled "DEFENSE OF SUITS NOT COVERED BY OTHER

INSURANCE", Westfield owes STW an independent duty to defend "any suit seeking damages

which are not payable on behalf of the insured under the terms of the" underlying policies because

"such damages are not covered thereunder" or because the underlying limits have been exhausted.

---

[20] An "occurrence" is defined under the policy as "an accident, including continuous or repeated exposure to substantially the same harmful conditions."  **Exhibit 7, p. 9.**

[21] This Westfield excess policy is an "umbrella" policy because, in addition to providing excess coverage for risks covered by the underlying policies, the policy provides both primary liability coverage and an independent duty to defend for certain risks not covered by the underlying policies. *See Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 336 n. 4 (4th Cir. 2008).

[22] The policy defines "personal injury" to include "bodily injury, shock, mental anguish, sickness or disease…" **Exhibit 10, p. 6.**

**Exhibit 10**. As with the 1988-89 CGL Policy, no exclusions under the 1988-89 Umbrella Policy apply to the claims brought against STW.

## V.  ARGUMENT

A.   **STW is entitled to summary judgment in that Westfield owes a continuing duty to defend STW in each of the underlying actions under the 1988-89 CGL Policy.**

1.   **Each of the underlying claims comes within the coverage of the 1988-89 CGL Policy.**

Under the 1988-89 CGL Policy, Westfield agreed to insure STW against any and all sums that STW "becomes legally obligated to pay as damages due to 'bodily injury' which occurs during the policy period." Westfield further took on both the duty and the right to defend STW against any action seeking such damages.

Each of the underlying plaintiffs' allegations against STW comes within the coverage of the Insuring Agreement to the 1988-89 CGL Policy.

(a)   <u>Edwards</u>.  Mr. Edwards has alleged that he suffers from renal cell carcinoma as a result of his exposure to nephrotoxic chemicals while he was employed at the Bayer facility in Marshall County from 1962 to 2001. Mr. Edwards alleges that STW is responsible for his cancer as a result of its allegedly negligent, careless and reckless manufacture, installation, repair, inspection, and maintenance of storage tanks containing nephrotoxic chemicals at his work site. *See* <u>Edwards</u> Complaint [Doc. 176-1, pp. 1-7].

(b)   <u>Price</u>.  Mrs. Price alleges that her late husband contracted acute myeloid leukemia and died as a result of his workplace exposure while employed at the Bayer plant from 1960 to 1995. Mrs. Price alleges that STW was responsible for her husband's leukemia and death by its alleged negligent manufacture, installation, repair, and/or inspection of the tanks from which

benzene or formaldehyde products escaped and contaminated her husband. *See* Price Complaint [Doc. 176-1, pp. 8-28].

      (c)    Steele.  Mr. Steele alleges that he suffers from chronic lymphocytic leukemia as a result of his exposure to benzene products in the course of his employment at the PPG plant from 1968 to 2006.  Mr. Steele alleges that STW is responsible for his cancer as a result of its allegedly negligent, careless and reckless manufacture, installation, repair, inspection, and maintenance of benzene storage tanks at his work site. *See* Steele Complaint [Doc. 176-1, pp. 29-48].

      Each of the underlying plaintiffs' cancers (and Mr. Price's resulting death) constitutes "bodily injury" under the Policy which defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Furthermore, the underlying plaintiffs' have each alleged facts to support a finding that their injuries resulted from an "occurrence" which is defined under the Policy as an "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Finally, each of the underlying plaintiffs have alleged their injuries resulted from an "occurrence" within the "coverage territory".

      The only question remaining to be determined is whether the underlying plaintiffs' "bodily injuries" are alleged to have occurred during the "policy period" from January 1, 1988 to April 15, 1989, under the 1988-89 CGL Policy.  In the context of latent bodily injuries arising from exposures to hazardous substances, the question of when the injury occurs implicates what is known as the "trigger of coverage".

      **2.**    **Trigger of Coverage—Generally.**

      The term "trigger of coverage" is not a term that is found in CGL or umbrella liability policies but rather is a term of art used to describe that which must occur during the policy period

under "occurrence-based" policies in order for the potential of coverage to arise under the policy.

*Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 913 P.2d 878, n.2 (1995).

> Unlike "claims-made" policies in wide use today, which require the assertion of a claim against the insured during the policy period, NGS's "occurrence-based" policies respond to liabilities arising out of "bodily injury" or "property damage" that took place during the time that such policies were in effect, even if the claim is not made until years after the termination of the policy.

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1192 (2d Cir. 1995). Ordinarily, no thought need be given to whether an injury has occurred during the policy period because the commission of a negligent act leads closely in time to an injury; however, in cases involving hazardous exposures or environmental contamination, the "bodily injury" or "property damage" may not be detected for many years. The Courts have devised four "trigger of coverage" theories to determine whether latent bodily injury or property damage has occurred within the policy period under the insuring clause of the typical CGL and umbrella liability policies. The four "trigger of coverage" theories are (1) exposure trigger, (2) injury-in-fact trigger, (3) manifestation trigger, and (4) continuous or multiple trigger. *Imperial Cas. & Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437, 1441 (E.D.N.C. 1994).

Under the exposure trigger the bodily injury is deemed to have occurred during the policy period whenever the claimant has been shown to have been exposed to a harmful substance during the policy period. *Ins. Co. of N. Am. v. Forty-Eight Insulations*, 633 F.2d 1212, 1225 (6th Cir. 1980); *Imperial Casualty, supra*. Under this theory, coverage is triggered under an "occurrence-based" policy whenever an exposure to harmful chemicals occurs during the policy period, regardless of whether the physical symptoms manifest outside the policy period. *Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1145 (5th Cir. 1981).

14

Under the injury-in-fact trigger, the claimant must suffer actual injury during the policy period for the claim to be covered. *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir. 1984). The injury need not be diagnosed or even diagnosable (*i.e.,* the injury need not "manifest") during the policy period in order for there to be coverage under the injury-in-fact trigger. *Id.*; *Westfield Ins. Co. v. Weis Builders, Inc.*, 2004 U.S. Dist. LEXIS 13658 *10-11 (D. Minn. July 1, 2004).

The manifestation trigger requires the claimant's injury to be diagnosed or discovered during the policy period in order to find coverage. *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 34 (1st Cir. 1982). Under this theory, the fact the claimant may have been exposed to harmful substances during the policy period is immaterial. Likewise, the fact that claimant's cancer, asbestosis, or other disease process may have begun or progressed during the policy period is immaterial. Under the manifestation trigger the date of claimant's diagnosis is all that matters. *Id*; *but see Travelers Indem. Co. v. Acadia Ins. Co.*, 2009 U.S. Dist. LEXIS 133272, *12-13 (D. Vt. Feb. 13, 2009) (remanded on other grounds) (The policy "makes no mention that such damage be discovered or become manifest during the policy period. To read it otherwise would essentially transform the policy from the occurrence-based policy both parties clearly intended it to be, to a claims-based policy providing coverage based on when particular claims are made.").

Under the continuous or multiple trigger theory, each "occurrence-based" CGL and umbrella liability policy insuring the risk from the date of initial exposure through the date of manifestation is triggered. *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1041 (D.C. Cir. 1981). Under the continuous trigger, "bodily injury" within the meaning of the policies is viewed

15

to include "any part of the single injurious process" from initial exposure, through "exposure in residence"[23] to manifestation. *Id.* at 1047.

Each of the underlying plaintiffs' allegations may be reasonably interpreted as alleging harmful exposure and bodily injury taking place during the policy period under the 1988-89 CGL Policy (*i.e.,* between January 1, 1988 and April 15, 1989). Consequently, under three of the four trigger theories—the exposure, the injury-in-fact, and the continuous triggers—the plaintiffs' allegations in each of the underlying actions trigger coverage along with Westfield's duty to defend under the Policy.

Not surprisingly, Westfield argues for the Court to adopt and apply the manifestation trigger—the only trigger theory which would relieve it of its responsibilities under the policies issued to STW. The Court should reject the application of the manifestation trigger as contrary to West Virginia law.

3.    **The West Virginia Supreme Court of Appeals will likely adopt a continuous or multiple trigger theory in support of coverage.**

In the absence of "relevant West Virginia state substantive law addressing the issue at hand, this Court must predict how West Virginia state courts would act if confronted with the same issue." *Jackson v. Allstate Ins. Co.,* 132 F. Supp. 2d 432, 434 (N.D.W. Va. 2000). Further, "[i]n predicting how West Virginia state courts would act, the Court must not expand upon the laws of West Virginia." *Id.* (citations omitted).

> The *Erie* doctrine requires us, in diversity cases, to apply substantive state law as it has been applied by the state's highest court. *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 18 L. Ed. 2d 886, 87 S. Ct. 1776 (1967). If there is no decision by that court which is directly on point, as here, then we must give "proper regard" to relevant rulings of other courts of the state in order to predict how the high court would rule. *Id.*

---

[23] "Exposure in residence" is the period of time from initial exposure in which the claimant's disease develops undetected until manifestation. *Owens-Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 981 (1994).

*Burris Chem v. USX Corp.*, 10 F.3d 243, 248 (4th Cir. 1993) (J. Hall dissenting).

> a.   **Two West Virginia Circuit Courts have applied the "continuous or multiple" trigger in latent bodily injury and property damage actions.**

The first known application of a coverage trigger in West Virginia appears to be a Memorandum Opinion and Order entered on October 28, 2003, by (then) Ohio County Circuit Judge James P. Mazzone in the matter styled *Wheeling Pittsburgh Corp. v. Am. Ins. Co.*, Civil Action No. 93-C-340. **Exhibit 12.** In *Wheeling Pittsburgh*, the Wheeling Pittsburgh Steel Corporation and its parent company brought an action for declaratory judgment in the Circuit Court of Ohio County, West Virginia, against several insurance companies that had insured the companies under successive umbrella liability insurance policies over a twenty-five year period. The plaintiffs sought a determination as to the appropriate trigger of coverage under the policies and the liabilities of the insurers for the costs of remediating multiple industrial sites which had undergone progressive environmental contamination and damages. *Id*. at 2. For his Order granting the insureds partial summary judgment, Judge Mazzone reviewed and approved the rationale of the United States Court of Appeals' decision in *Keene* and the California Supreme Court's opinion and ruled that the "continuous or multiple" trigger should apply in West Virginia. *Id*. at 23-24.

> [T]he Court finds and concludes that the continuous or multiple trigger theory is applicable to the present action insofar as all named defendants' policies in effect during the relevant time periods may be potentially invoked by the Plaintiff to provide coverage for actual property damages proven to be continuous or progressively deteriorating throughout the several policy periods. In adopting the continuous or multiple trigger approach, the Court notes, by way of example, the opinions of numerous other jurisdictions the Court finds persuasive. See <u>Keene v. Insurance Co. of North America</u>, 667 F.2d at 1043 (D.C. Cir. 1981); <u>Montrose Chemical Corp. of California v. Admiral Ins. Co.</u>, 10 Cal. 4th 6435, 913 P.2d 878 (1995); <u>In re Prudential Lines, Inc.</u>, 158 F.3d 65, 83 (2nd Cir. 1998); <u>New Castle County v. Continental Casualty Co.</u>, 725 F. Supp. 800 (1989) *aff'd in part rev'd in part* 933 F.2d 1162 (3rd Cir. 1991); <u>J.H. France Refractories Co. v. Allstate Ins. Co.</u>, 534 Pa. 29, 626 A.2d 502 (Pa. 1993); <u>Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.</u>, 145 Md. App. 256, 802 A.2d 1070 (Md. App. 2002); <u>Owens-Illinois,</u>

> Inc. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994); Trustees of Tufts Univ. v.
> Commercial Union Ins. Co., 415 Mass. 844, 616 N.E.2d 68 (1993); Harford County
> v. Harford Mutual Ins. Co., 327 Md. 418, 610 A.2d 286 (1992).

*Id.* at 25.

A second West Virginia circuit court decision predicting that the Supreme Court of Appeals

of West Virginia would adopt a continuous or multiple trigger of coverage is *U.S. Silica Co. v. Ace*

*Fire Underwriters Ins. Co.*, 2012 W.V. Cir. LEXIS 4449 (Nov. 27, 2017 Morgan Co. Cir. Ct).

**Exhibit 13**. *U.S. Silica Co.*, involved an action for declaratory judgment requesting that the court

declare the insured's right to a defense and indemnity under CGL policies issued by Travelers

Indemnity Company. *Id.* In several underlying actions, U.S. Silica was alleged to have caused

claimants' bodily injuries from exposure to silica sand. *Id.* at *5-6. Judge Frye looked to Judge

Mazzone's decision in *Wheeling Pittsburgh Corp.*, *supra*, the decision of the Court of Appeals in

*Keene*, *supra*, the Pennsylvania Supreme Court's decision in *J.H. Fr. Refractories Co., v. Allstate*

*Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993), and the California Supreme Court's decision in

*Montrose*, *supra,* in adopting the continuous or multiple trigger of coverage.

> This court finds that a continuous trigger theory is applicable to the instant case and
> will apply a continuous trigger of coverage to the pending silica claims as the suits
> allege continuing or progressively deteriorating bodily injury…The effect being
> that insurers are obligated to indemnify insured for costs associated with liability
> beginning when the first exposure occurred (the beginning of the accident) and until
> the claim is brought, or until the underlying claimant dies whichever occurs first.

*Id.* at *30-31. While certainly not binding on this Court, Judge Mazzone's and Judge Frye's

decisions are certainly evidence as to how the Supreme Court of Appeals of West Virginia may

rule on the issue. Moreover, there is no basis under the *Erie* doctrine for the Court to give greater

weight to the predictions of other federal district courts over that of West Virginia circuit courts as

to the application of West Virginia law.

   b. **The CGL policy language providing that coverage only applies to bodily injury and property damage which *"occurs during the policy period"* is ambiguous in latent disease cases and must be interpreted in STW's favor to find coverage.**

  The many courts addressing the application of one coverage trigger over another have disagreed as to whether the policy language requiring that bodily injury occur during the policy is ambiguous. Some have found there to be no ambiguity while others have reached the opposite conclusion and found these policies to be ambiguous specifically in their application to latent injuries. *See, e.g., Keene*, 667 F.2d at 1041 ("Unfortunately, the insurance companies failed to develop policy language that would directly address the full complexity entailed by asbestos-related diseases.").

  Ambiguous policy provisions are to be "construed liberally in favor of the insured." *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 194, 342 S.E.2d 156, 160 (1986). The fact that the courts have developed several differing trigger theories to justify the interpretation and application of the policy language requiring that covered injuries "occur during the policy period" is a clear indication that these policies are ambiguous. *Glen Falls Ins. Co.*, 217 W. Va. at 221 ("To be ambiguous, the policy provision must be reasonably susceptible of two different meanings or [be] of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning."). It is the "vague temporal requirement" of these policies which renders ambiguous their application to latent injury claims. *See Keene*, 667 F.2d at 1043 ("In the context of asbestos-related disease, the terms 'bodily injury,' 'sickness' and 'disease,' standing alone, simply lack the precision necessary to identify a point in the development of a diseases at which coverage is triggered."); *Forty-Eight Insulations, Inc.*, 633 F.2d at 1222 ("[T]here is usually little dispute as to when an

injury occurs when dealing with a common disease or accident …[but] there is considerable dispute as to when an injury from [a latent disease] should be deemed to occur.").

The Court should find, as a matter of law, that the requirement under the 1988-89 CGL Policy that "[t]his insurance applies only to 'bodily injury' and 'property damage' *which occurs during the policy period*" is ambiguous in its application to latent bodily injuries. The Court should further find that the Supreme Court of Appeals of West Virginia would adopt the continuous or multiple trigger of coverage and find that all insurers on the risk from initial exposure to diagnosis are liable for STW's defense and indemnity. Only by the adoption of a continuous or multiple trigger for all cases going forward may the court fashion an appropriate, prospective remedy. The selection of any of the other trigger theories as a universal or prospective rule would grant certain insurers the benefit of the ambiguous insurance language over its own insureds, as well as other insurers on the risk.

Westfield will rely on the District Court's decision in *State Auto Prop. & Cas. Ins. Co. v. H.E. Neumann Co.*, 2016 U.S. Dist. LEXIS 130172 (S.D.W. Va. Sep. 23, 2016) vacated by *State Auto Prop. & Cas. Ins. Co. v. H.E. Neumann Co.*, 2017 U.S. Dist. LEXIS 66099 (S.D.W. Va. Mar. 17, 2017), as support for the application of the manifestation trigger. The District Court's decision in *State Auto* illustrates the difficulty in adopting any trigger theory to be applied on a prospective basis other than the continuous or multiple trigger. The *State Auto* Court found its application of the manifestation trigger to be justified, due in part in that case, on the grounds the policy language was ambiguous and that the application of the manifestation trigger supported coverage under the policy. *Id.* *59. The Court also found that the manifestation theory comported with the "reasonable expectations" of the parties by protecting "the insured against unknown risks." *Id.* *61. The *State Auto* Court's reliance on the ambiguity of the policy language and the reasonable

20

expectations of the insured appears to contradict the Court's suggestion that the manifestation trigger should be applied prospectively in other latent disease cases.

    c.    **The West Virginia Supreme Court of Appeals would likely reject the manifestation trigger.**

For the reasons noted above, the Supreme Court of Appeals of West Virginia is likely to reject the application of the manifestation trigger under circumstances, such as the matter *sub judice*, in which the insurer would effectively receive the benefit of the ambiguous policy language. There are additional reasons to support the conclusion that the Supreme Court of Appeals of West Virginia would reject the application of the manifestation trigger.

For one, the sheer number of courts rejecting the manifestation theory in favor of one or more alternative coverage triggers is significant.[24]  Among the many courts to have rejected the manifestation trigger are the highest courts of Maryland, Ohio and Pennsylvania.  Each of these neighboring states have adopted the continuous or multiple trigger over the manifestation trigger alone.  *Lloyd E. Mitchell, Inc. v. Md. Cas. Co.*, 324 Md. 44, 595 A.2d 469 (1991); *Harford Cty. v Harford Mut. Ins. Co.*, 327 Md. 418, 610 A.2d 286 (1992); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St. 3d 512, 769 N.E.2d 835 (2002); *Pa. Gen. Ins. Co. v. Park-Ohio*

---

[24] *See, e.g., Guar. Nat'l Ins. Co. v. Azrock Indus.*, 211 F.3d 239, 248 (5th Cir. 2000) overruled on other grounds; *OneBeacon Ins. Co. v. Don's Bldg. Supply, Inc.* 553 F.3d 901 (5th Cir. 2008) (manifestation theory based on a fiction that suggests a person is injured on the date of diagnosis); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178 (2d Cir. 1995); *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760 (2d Cir. 1984); *Porter*, 641 F.2d 1128 (5th Cir. 1981); *Forty-Eight Insulations*, 633 F.2d at 1225 (6th Cir. 1980); *Keene, supra; Montrose, supra; Gencorp., Inc. v. AIU Ins. Co.*, 104 F. Supp. 2d 740, 750 (N.D. OH 2000) (manifestation theory rejected as "unsupported by the policy language."); *Imperial Cas. & Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437, (E.D.N.C. 1994); *MAPCO Alaska Petroleum v. Cent. Nat'l Ins. Co.*, 795 F. Supp. 941, 948 (D. Alaska 1991) (manifestation trigger rejected in environmental contamination actions); *Consulting Eng'rs v. Ins. Co. of N. Am.*, 710 A.2d 82, 87 (Pa. Super. Ct. 1998); *Gelman Scis. V. Fid. & Cas. Co.*, 456 Mich. 305, 572 N.W.2d 617, n.7 (1998), overruled in part on other grounds, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003); *EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's*, 150 N.H. 828, 834, 848 A.2d 715, 720 (2004); *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968 (3d Cir. 1985); *Nat'l Union Fire Ins. Co. v. Porter Hayden Co.*, 331 B.R. 652 (D. Md. 2005); *Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 98 P.3d 572, 602 (Ct. App. 2004); *R.T. Vanderbilt Co. v. Hartford Accident & Indem.* Co., 171 Conn. App. 61, 156 A.3d 539 (2017).

*Indus.,* 126 Ohio St. 3d 98, 930 N.E.2d 800 (2009); *J.H. France Refractories Co.,* 626 A.2d 502

(1993).

Maryland's adoption of the continuous trigger is significant for another reason. In *Harford,*

Maryland's highest court effectively overturned the U.S. Court of Appeals' prior decision in *Mraz*

*v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir. 1986), in which the Court of Appeals

predicted the adoption of the manifestation trigger under Maryland law. *Harford,* 327 Md. at 436.

In a recent footnote, the U.S. Court of Appeals implicitly acknowledged Maryland's rejection of

*Mraz*:

> WECCO and the Insurers agree that under Maryland law, "asbestos-related injury
> begins with exposure, carries forward while the asbestos fibers are in residence and
> continues through to manifestation of the disease." *In re Wallace & Gale Co.,* 385
> F.3d at 828 (quoting *In re Wallace & Gale Co.,* 275 B.R. 223, 238 (D. Md.
> 2002), *modified in part on other grounds,* 284 B.R. 557 (D. Md. 2002)). In other
> words, exposure to asbestos can cause a continuing, long-lasting "injury" that
> begins with the exposure and generally ends with the manifestation of an asbestos-
> related disease. *See Keene Corp. v. Ins. Co. of N. Am.,* 667 F.2d 1034, 1038 n.3,
> 215 U.S. App. D.C. 156 (D.C. Cir. 1981). Accordingly, an asbestos-related bodily
> injury may—and almost always does—span and trigger coverage across
> multiple insurance policies.

*General Ins. Co. of Am. v. United States Fire Ins. Co.,* 886 F.3d 346, n.1 (4th Cir. 2018).

From January 1, 1985 to April 15, 1989, STW was insured under "occurrence-based" CGL

and umbrella policies purchased from Westfield. Beginning on April 15, 1989, up to April 15,

2001, Westfield only insured STW against liability for claims arising from "products and

completed operations" on a "claims made" basis. There is no coverage for the underlying claims

under those "claims made" policies because the claimants' injuries did not manifest until after the

policy periods had expired. The Court's adoption of the manifestation trigger, as urged by

Westfield, would effectively turn STW's "occurrence-based" 1988-89 CGL and Umbrella Policies

into "claims made" policies—to the detriment of STW. *Trizec Properties, Inc. v. Biltmore Constr.*

*Co.*, 767 F.2d 810, n.6 (11th Cir. 1985); *See also Montrose*, 3 Cal App. 4th at 1528 ("To read an occurrence policy to afford coverage only when the injury or damage becomes manifest during the policy period...unfairly transforms the more expensive occurrence policy into a cheaper claims-made policy."). Such an outcome would be manifestly unjust and contrary to the language of the policy and should be rejected.

From the above case authority, coupled with West Virginia's practice of strict construction of both ambiguous policy terms and exclusionary provisions against the insurer, the Court should find and declare, as a matter of law, that coverage is triggered under the 1988-89 CGL Policy and that Westfield owes STW a continuing duty to defend in each of the remaining underlying actions.

> **d.    The manifestation trigger must be rejected based upon the parties' course of performance under the CGL policies.**

The Court should further weigh and reject Westfield's argument for the manifestation trigger in light of the parties' "course of performance" under the policies which informs their interpretation and construction of the contract's terms. *Kaiser Aero & Elecs. Corp. v. Alliant Techsystems,* 1997 U.S. App. LEXIS 35509 *14 (4th Cir. Dec. 17, 1997) (applying West Virginia law); *See also* <u>W.Va. Code</u> § 46A-1-102(2); <u>Restatement (Second) of Contracts</u>, §202. STW was named as a defendant in a prior civil action alleging benzene exposure which was filed on October 23, 2014, and styled *Bowen v. Axial Corp.,* Marshall County, WV, Civil Action No. 14-C-173K. **Exhibit 14**. In allegations very similar to the underlying action in *Steele,* Vicki Bowen alleged that she had been exposed to the chemical benzene over a period of more than thirty years while employed at PPG's/Axiall's Marshall County plant. **Exhibit 14, ¶10.** Bowen named STW as a defendant and alleged that STW had negligently manufactured, installed, inspected, repaired, and maintained benzene tanks at the site. **Exhibit 14, ¶¶38-44.**

On May 20, 2015, Westfield set forth its reservation of rights in the *Bowen* matter in a letter to STW.  Letter from Judy Ellis to Jason Morgan, dated May 20, 2011, **Exhibit 15**.  Westfield agreed to provide a defense to STW in the Bowen action and further agreed to accept coverage for her claims "to a limited extent" under the CGL policies.

> Westfield Insurance will agree to provide a defense to Sistersville Tank Works, Inc. in the above matter under a full and complete reservation of rights.  Westfield is willing to accept coverage to a limited extent.  *Coverage is limited to the period of time during which the Plaintiff was exposed to asbestos and the bodily injury claimed by the Plaintiff occurred within the policy periods of the Westfield Insurance Commercial Liability policy.*

**Exhibit 15, p.6** (emphasis added).[25]

Westfield's concession of "limited" coverage under the facts alleged in Bowen—which mirror the allegations in the underlying actions—is a direct repudiation of the manifestation trigger under the insuring agreements to the CGL policies.  By acknowledging coverage in Bowen during the period of time she "was exposed" to benzene Westfield had rejected a so-called manifestation trigger.  Instead, Westfield argued for and defended STW (and STW accepted Westfield's defense) in Bowen under an exposure or injury-in-fact trigger (or multiple triggers).  Simply stated, if Westfield believed that its policy language required a manifestation trigger it would not have looked to the time of Bowen's exposure as a relevant consideration.

For her complaint, Bowen alleged that she was diagnosed with myelodysplastic syndrome in January 2014.  **Exhibit 14, ¶11**.  This diagnosis was made nearly three years after STW's 1989-2010 CGL Policy expired.  For its reservation of rights, Westfield omitted any mention of the fact that Bowen's condition was diagnosed or manifested after the policy period.  Westfield's prior concession to even limited coverage in its reservation of rights—despite Bowen's condition not

---

[25] Westfield employed the exact same language as *Bowen* in prior reservations of rights letters sent to STW regarding the *Hubbard* and *Fischerkeller* actions.  **Exhibit 16 and Exhibit 17**.  Westfield made no mention of the dates of the claimants' diagnoses or the "manifestation" of their injuries in any of its previous reservations of rights.

being diagnosed until four years after the last policy period—Westfield acknowledged that coverage under the Policy is triggered by something other than the manifestation of the claimant's injury. Westfield's advocacy of the manifestation trigger is clear contradiction of its prior interpretation of the same ambiguous policy language.

The Court should find, as a matter of law, that by their course of performance under the policies prior to the filing of the underlying actions, the parties have agreed that the manifestation trigger is not the appropriate trigger of coverage under the policies.

### 4. No exclusions under the 1988-89 CGL Policy apply.

Once the Court is satisfied that the underlying plaintiffs' claims fall within the language of the insuring agreement to the policy, the burden shifts to Westfield to prove the application of any exclusion. *Bowyer v. Hi-Lad, Inc.*, 216 W.Va. 634, 609 S.E.2d 855 (2004); *Nat'l Mut. Ins. Co. v. McMahon & Sons,* 177 W.Va. 734, 356 S.E.2d 488 (1987), overruled on other grounds, *Potesta v. United States Fid. & Guar. Co.,* 202 W.Va. 308, 504 S.E.2d 135 (1998). Westfield cannot, simply because there are no applicable exclusions under the 1988-89 CGL Policy.[26]

Based upon all of the foregoing, the Court should find, as a matter of law, that STW is entitled to summary and declaratory judgment that Westfield owes STW a continuing duty to defend in each of the underlying actions under the terms of the 1988-89 CGL Policy.

---

[26] Both the 1988-89 CGL Policy and the 1988-89 Umbrella contain substantially the same limited pollution exclusion which by their terms do not apply to the claims against STW in the underlying actions. *See* Section I. Coverage A. (2)(f) of the Coverage Form. **Exhibit 7;** *see* **Exhibit 10.** In a filing to the West Virginia Insurance Commissioner dated March 1, 1986, Westfield has represented that this "revised pollution exclusion does not apply to damages arising out of the insured's products or completed operations, nor to other off-premises discharges of pollutants not specifically excluded. **Exhibit 18.**

**B.**   **STW is entitled to summary and declaratory judgment that Westfield owes a continuing duty to STW to defend it in each of the underlying actions under the 1985-88 CGL Policy.**

**1.**   **The existence of the 1985-88 CGL Policy issued by Westfield to STW is not disputed.**

Westfield no longer appears to be disputing that it issued STW comprehensive general liability and umbrella insurance effective starting on January 1, 1985. **Exhibit 19**. This insurance is evidenced by, among other things, a "Certificate of Insurance" (hereinafter "Certificate") signed and issued by John R. Padden of Reagle & Padden, Inc., on behalf of Westfield. Syl. Pt. 9, *Marlin v. Wetzel Co. Bd. of Educ.*, 212 W.Va. 215, 569 S.E.2d 462 (2001) (certificate of insurance is evidence of coverage). **Exhibit 9**. The Certificate reflects several forms of liability coverage issued to STW beginning January 1, 1985, including a CGL policy (Policy No. CCP193464) with a 3-year term from 1/1/85 to 1/1/88 (hereinafter "1985-88 CGL Policy"); and an "Excess Liability (Umbrella Form)" policy with a 1-year term (hereinafter "1985 Umbrella Policy").[27] The 1985-88 CGL Policy is an "occurrence" which included coverage against liability arising from "PRODUCTS/COMPLETED OPERATIONS." **Exhibit 9**. The 1985-88 CGL Policy contains $1,000,000 "each occurrence" and "aggregate" policy limits. **Exhibit 9**. The 1985 Umbrella Policy provides an additional $2,000,000 of insurance limits. **Exhibit 9**.

**2.**   **There is no evidence to overcome the presumption under West Virginia law that the terms and conditions of the 1985-88 CGL Policy are the same as the 1988-89 "renewal" CGL Policy.**

As noted, a copy of STW's 1988-89 CGL Policy issued by Westfield has been located. This policy was a "renewal" of the 1985-88 CGL Policy. **Exhibit 8**. The law in West Virginia and throughout the United States presumes that the 1985-88 CGL Policy contains the same terms

---

[27] The 1985 Umbrella Policy was Policy No. UXC121583. The 1987 Umbrella Policy is Policy No. UXC129553. **Exhibit 12**. The policy number for the 1986 Umbrella Policy is unknown.

and conditions as its "renewal" policy.  *See Sheppard v. Farmers' Mut. Fire Ass'n*, 106 W.Va. 177, 145 S.E. 181, 182 (1928); *Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670, 690 (W.D. Mich. 2003); *Massachusetts Bonding & Ins. Co. v. R.E. Parson Co.*, 61 F.2d 264, 268 (8th Cir. 1932); *Travelers Indem. Co. v. Rogers Cartage Co.*, 98 N.E.3d 524, 531 (Ill. App. 1st Div., 2017) ("[T]he renewal agreement is presumed to adopt and have reference to the terms of the existing or expiring policy."); *see generally Northeast Utils. v. Century Indem. Co.*, 1999 Conn. Super. LEXIS 1660 *10-12 (June 21, 1999) (gathering cases supporting the presumption that the terms of a renewal policy are the same as the original).

Westfield has proffered no evidence in discovery demonstrating any material differences between the 1985-88 CGL Policy and its "renewal" 1988-89 CGL Policy.  STW has demonstrated that it is entitled to a defense from Westfield under the 1988-89 CGL Policy.  *See* discussion *supra*. In the absence of any evidence to overcome the presumption, or even create a question of fact that the terms of the two policies are the same the Court should further find and declare, as a matter of law, that STW is entitled to a defense by Westfield under the 1985-88 CGL Policy, as well.

## C.  The Court should abstain from declaring the parties' rights under the 1989-2010 CGL Policy.

As the Court is well aware, Westfield instituted this declaratory judgment action seeking a declaration from the Court that it owes no duty to STW to defend or indemnify it in each of the underlying state court actions.[28]  For its Complaint, Westfield identified only the 1989-2010 CGL Policy for the Court to consider.  However, during discovery STW located the complete 1988-89 CGL and Umbrella Policies along with substantial evidence of the original 1985-88 CGL and Umbrella Policies.  For the reasons noted above, these 1985-89 policies provide coverage for each

---

[28] On June 14, 2019, the <u>Sandy</u> matter was dismissed without prejudice, leaving three underlying state court actions pending.  **Exhibit 3, Sandy Dismissal Order.**

of the underlying actions.  Once the Court has determined that coverage and a duty to defend exist, Westfield will have received the only declaration and relief to which it is entitled.  Westfield's request for a declaration of the parties' rights under the 1989-2010 CGL Policy would be moot.

This Court has recognized that "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome" and that "'[m]oot questions require no answer' and federal courts are without jurisdiction to answer them because federal courts do not have the power to issue advisory opinions." *Lebron v. Coakley*, 2017 U.S. Dist. LEXIS 163640 *7-8 (N.D.W. Va. Aug. 22, 2017); quoting *Giovanni Carandola, Ltd. v. City of Greensboro*, 258 F. App'x 512, 515 (4th Cir. 2007).  Further, in *Lebron*, the Court noted that "[m]ootness principles derive from the requirement in Article III of the Constitution that federal courts may adjudicate only disputes involving a case or controversy."  *Id*. at 8.  Here, whether coverage exists for the underlying claims under the 1989-2010 CGL Policy is no longer "live" or in "controversy" once the Court determines that coverage exists under the 1985-88 and 1988-89 CGL Policies.

In *Lebron*, the Court provided further that "[a] change in factual circumstances can moot a case on appeal, such as when the plaintiff receives the relief sought in his or her claim or when an event occurs that makes it impossible for the Court to grant any effectual relief to the plaintiffs." *Id*. Here, a "change in factual circumstances" occurred when STW itself located the 1988-89 CGL Policy which provides coverage in the underlying actions thus rendering moot a determination as to the parties' rights under the 1989-2010 CGL Policy. As such, a determination of coverage under the 1989-2010 CGL Policy would no longer be ripe.   The parties would now likely have to await the filing of an action against STW alleging both exposures and bodily injury all occurring after April 15, 1989, before an interpretation of the 1989-2010 CGL Policy will be ripe.

A determination of coverage under the 1989-2010 CGL Policy at this stage should be avoided as it would constitute an advisory opinion by the Court. "Federal courts have never been empowered to issue advisory opinions" and, indeed, "may not render any advisory opinions." *FCC v. Pacifica Foundation*, 438 .S. 726, 735 (1978); *Page v. Kirby*, 314 F. Supp. 2d 619, 623 (N.D.W. Va. 2004). "Federal courts must decide live controversies and must avoid giving advisory opinions on abstract propositions of law." *Lamar Outdoor Advert. v. City of Weston*, 2018 U.S. Dist. LEXIS 101393 *7 (N.D.W. Va. June 18, 2018). The authority is clear that federal courts are not permitted to issue advisory opinions.

In *Smith v. State Farm Mut. Ins. Co.*, 2014 U.S. Dist. LEXIS 76326 *15-16 (N.D.W. Va. June 4, 2014), the Court provided that "a federal court has neither the power to render advisory opinions nor to decide question that cannot affect the rights of litigants in the case before them." Moreover, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all." *Trawick Constr. Co., LLC v. Modern Cable Tech Inc.*, 2016 U.S. Dist. LEXIS 107685 *9 (N.D.W. Va. Aug. 15, 2016) (citation and quotation omitted). An advisory opinion "could be a mistake, because it would consume judicial time in order to produce a decision that may turn out to be irrelevant." *Id*. at 10 (citation omitted).

For all of these reasons, the Court should decline to declare the parties' rights under the 1989-2010 CGL Policy.

**D. Alternatively, the Court should find that Westfield owes STW a duty to defend because the allegations in each of the underlying actions can be interpreted reasonably to include claims for injuries arising from STW's "ongoing operations" which are not excluded under the 1989-2010 CGL Policy.[29]**

In the event the Court determines it is necessary to consider coverage under the 1989-2010 CGL Policy (Policy No.3471223), the Court should find that Westfield owes STW a duty to defend under the policy in each of the underlying actions. Westfield relies upon the following endorsement/exclusion: "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard.'" Westfield contends that it has no duty to defend STW in the underlying cases under the 1989-2010 CGL policy based upon this "products-completed operations" exclusion.[30]

The Court should deny Westfield's motion for summary judgment. The plaintiffs in Edwards, Steele, and Price each allege that STW caused their injuries by negligently causing the escape of "toxic chemical liquids, vapors, fumes and/or gases" at their workplaces. The plaintiffs each allege that STW breached its duties to them by failing to: (a) "properly manufacture" chemical tanks, (b) "properly install" chemical tanks, (c) "thoroughly inspect" chemical tanks, (d) "recognize actual leaks, faults, flaws and imperfections to the integrity of the" chemical tanks, (e) "properly repair and/or maintain" chemical tanks, (f) create a safety plan for chemical tank use and maintenance, and (g) follow up to ensure safety plan was followed. [Doc. 176-1]. These allegations may reasonably be interpreted as alleging exposure from harmful substances to the plaintiffs as a result of STW's "ongoing operations," at the site, *i.e.,* the plaintiffs allege that they were injured from exposure while STW was on site performing, its work installing, inspecting,

---

[29] The language of the "Insuring Agreement" under the Coverage Form for the 1989-2010 CGL policy does not differ materially from the 1988-89 CGL Policy set forth herein above.

[30] This exclusion does not appear in the 1985-88 CGL Policy or the 1988-89 CGL Policy or any of the Umbrellas policies from 1985-1989. *See* discussion *supra*.

and repairing chemical tanks. *See Gen. Ins. Co. of Am. v. United States Fire Ins. Co.*, 886 F.3d 346, 350 (4th Cir. 2018). There is nothing from either the language or the context of the plaintiffs' allegations which would confine their meaning to the "products-completed operations" exclusion.

Had the parties intended for liability arising from any of STW's "ongoing operations" to be excluded they would have included an additional endorsement either excluding all or specific ongoing operations from coverage. *See, e.g., Lighton Indus. v. Allied World Nat'l Assurance Co.*, 348 F. Supp. 3d 167, 190 (E.D.N.Y. 2018); *Nautilus Ins. Co. v. Jirsa Constr. Co.*, 244 F. Supp. 3d 315 (W.D.N.Y. 2017); *Ohio Cas. Ins. Co. v. Island Pool & Spa, Inc.*, 418 N.J. Super 162, 173, 12 A.3d 719 (N.J. App. 2011); *Emanuel v. Ace Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 135314 *50 (D. Md. Nov. 23, 2011); *W. Bend Mut. Ins. Co. v. Am. Legion*, 2003 U.S. Dist. LEXIS 21776 *3 (D. Minn. Dec. 1, 2003).

"Generally, an insurer's duty to defend is broader than its duty to indemnify. An insurer must defend its insured if a claim against the insured could, without amendment, impose liability for risks the policy covers." *Edmond*, 785 F. Supp. 2d at 565 (citations omitted). Moreover, "[f]or the duty to defend to arise, the underlying complaint need not specifically and unequivocally make out a claim within the coverage." *Id.* (citations omitted). "Rather, the underlying claims must be reasonably susceptible of an interpretation that they are covered by the insurance policy." *Id.*

Because each of underlying plaintiffs have alleged injuries arising from STW's then "ongoing operations" the Court must find, as a matter of law, that STW is entitled to summary judgment as to Westfield's continuing duty to defend STW under the 1989-2019 CGL Policy.[31]

---

[31] For its complaint, Westfield also cites to a "total pollution" exclusion which appears under the 1989-2010 CGL Policy. The Court need not address the application of the "total pollution" exclusion inasmuch as it appears in fewer than half of the policy years under the 1989-2010 CGL Policy. [Doc. 1, ¶¶51-66].

## VI. CONCLUSION

For all of the foregoing reasons, Defendant Sistersville Tank Works, Inc., requests that the Court grant it summary judgment and declare that Plaintiff Westfield Insurance Company has a duty to defend Sistersville Tank Works, Inc., to a verdict and/or judgment in the below civil actions pending in the Circuit Court of Marshall County, West Virginia.

<div style="margin-left:50%">

SISTERSVILLE TANK WORKS, INC.,
Defendant/Counterclaim Plaintiff/
Third-Party Plaintiff

By:   /s/ Patrick S. Casey
          Counsel for Defendant/
          Third-Party Plaintiff

</div>

Patrick S. Casey (WV Bar #668)
Sandra M. Chapman (WV Bar #701)
D. Kevin Coleman (WV Bar #6018)
Ryan P. Orth (WV Bar #13029)
CASEY & CHAPMAN, PLLC
1140 Chapline Street
Wheeling, WV 26003
304-231-2405
866-296-2591 (fax)